# United States Court of Appeals
## For the First Circuit

No. 07-1896

BRIAN DIXON,

Plaintiff, Appellant,

v.

SHAMROCK FINANCIAL CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Howard, Circuit Judge,

Stahl and Siler[*], Senior Circuit Judges.

Daniel A. Edelman, with whom Cathleen M. Combs, James O. Latturner, Edelman, Combs, Latturner & Goodwin, LLC, Christopher Lefevbre, Claude Lefebvre, and Christopher Lefebvre, P.C. were on brief, for appellant.
Jeffrey R. Martin, with whom Burns & Levinson LLP was on brief, for appellee.
James W. McGarry, Thomas M. Hefferon, Joseph F. Yenouskas, and Goodwin Procter LLP, on brief for amicus curiae American Financial Services Association, Consumer Mortgage Coalition, and Mortgage Bankers Association.

April 3, 2008

[*]Of the Sixth Circuit, sitting by designation.

**HOWARD**, **Circuit Judge**.  Plaintiff Brian Dixon, for himself and a class, claims that defendant Shamrock Financial Corporation unlawfully accessed his credit report, in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681.  The district court granted Shamrock's motion to dismiss, and Dixon now appeals.  Guided largely by our recent ruling in Sullivan v. Greenwood Credit Union,___ F.3d ___, 2008 WL 726135, (1st Cir. Mar. 19, 2008), we affirm.

## I.

Plaintiff Brian Dixon received a mailer from Shamrock Financial Corporation ("Shamrock"), the contents of which are the subject of this appeal.  Dixon claimed that Shamrock unlawfully accessed his credit report in order to solicit him, in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681.

The FCRA regulates access to individuals' "consumer reports" (commonly known as credit reports).  An entity may gain access to an individual's consumer report only with the written consent of the individual, unless the consumer report is to be used for certain "permissible purposes," in which case written consent is not required.  Id. § 1681b.  One such permissible purpose is to extend a firm offer of credit or insurance.  Id. § 1681b(c).  Lenders thus do not need written consent in order to access certain information about individuals from their consumer reports, provided they make a firm offer of credit to those individuals.  Within this

-2-

framework, lenders do not gain access to any individual consumer's full consumer report. Rather, lenders receive names and addresses of consumers who fit a given credit profile. Id. § 1681b(c)(2). Lenders must then extend to those consumers whose names and addresses it has received a "firm offer of credit." This term has a specific meaning in the statute which we will discuss later. Essentially, however, a "firm offer of credit" is defined by the FCRA as an offer that may be conditioned on additional preexisting internal criteria set by a lender.

Dixon received a pre-screened mailer from Shamrock. The mailer opens with the heading: "IMPORTANT CREDIT INFORMATION OPEN IMMEDIATELY." A personal invitation to Dixon follows, from a "Kathy Kelly." Kelly addresses Dixon as follows:

> . . . Shamrock Financial's expertise is helping homeowners exactly like you. In just a few minutes, I can show you how you may restructure your debt, maximize tax benefits, improve your credit score and most importantly, save lots of money every month.

> Call [number] for a free consultation and a complete credit profile . . . .

> Shamrock Financial can pay off your revolving debt and refinance your mortgage balance at a lower rate. Your credit score could then increase 100 points or more.

The mailer also contained a set of disclaimers on the reverse side, as follows:

> TERMS & CONDITIONS: This offer is made by Shamrock Financial Corporation who is not affiliated with your current lender nor is it an agency of the government. This is not a commitment to make a loan. All approvals are subject to underwriting guidelines. Minimum and

-3-

maximum loan amount apply.  Rates and programs subject to change at any time . . . .

PRE-SCREEN & OPT-OUT NOTICE:  This "prescreened" offer of credit is based on information in your credit report indicating that you meet certain criteria.  This offer is not guaranteed if you do not meet our criteria (including providing acceptable property collateral).  If you do not want to receive prescreened offers of credit from this and other companies, call the consumer reporting agencies at [number] . . . .

Dixon does not allege that he ever contacted Shamrock, or was denied credit by Shamrock.  His claim is that Shamrock violated the FCRA by accessing his consumer report without extending to him a "firm offer of credit."  Dixon filed suit in United States District Court for the District of Massachusetts, on behalf of himself and a class of consumers in Massachusetts, Rhode Island, New Hampshire and Maine.  He sought relief under the FCRA's penalty provision, 15 U.S.C. § 1681n, providing statutory damages in the event of a willful violation of the statute, and also sought injunctive relief and class certification.

The district court granted Shamrock's motion to dismiss, finding that Shamrock had not violated the FCRA.

## II.

We review de novo the district court's Rule 12(b)(6) dismissal.  Torromeo v. Town of Fremont, 438 F.3d 113, 115 (1st Cir. 2006).

To survive a motion to dismiss, Dixon must plead facts that "raise a right to relief above the speculative level . . . ."

Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007) (internal citation omitted). We accept Dixon's well-pleaded facts as true, but reject "unsupported conclusions or interpretations of law." Wash. Legal Found. v. Mass. Bar Found., 993 F.2d 962, 971 (1st Cir. 1993).

Dixon's central thesis is that Shamrock's mailer did not constitute a "firm offer of credit," and thus Shamrock's act of accessing information from his consumer report was prohibited by the FCRA. Dixon argues this thesis along two lines: first, that Shamrock did not present him with a "firm offer"; and second, that the mailer did not in fact represent an offer of "credit."

We may dispense with the latter claim first. Dixon alleges that the mailer is just a "solicitation for business," but he has pled no facts in support of this claim. He tries to liken Shamrock's mailer to the mailer at issue in Cole v. U.S. Capital, 389 F.3d 719, 722 (7th Cir. 2004), where a pre-screened offer of credit was found to be a solicitation to sell cars and not an offer of credit at all. But unlike in Cole, here there are no allegations that Dixon or any other consumer was denied credit by Shamrock despite meeting Shamrock's internal criteria, or that Dixon or any other consumer would have been denied credit had they contacted the company. At the motion to dismiss stage, there has been no discovery of Shamrock's lending practices and whether Shamrock would have approved for a home loan any recipient of the

mailer who also met Shamrock's internal criteria. This does not matter, however, because of Dixon's inadequate pleading.[1] Dixon's argument that the mailer is a sham that does not actually represent an offer of credit goes no further.

Dixon's main argument thus focuses on whether Shamrock's mailer was sufficiently "firm" to constitute a "firm offer of credit" under the FCRA. Dixon argues that the mailer is not a firm offer because it violates common law conceptions of an "offer": it is not sufficiently definite, in that there are further conditions attached, and it fails to contain adequate loan terms.

In support of this proposition, Dixon cites to the Supreme Court's recent decision interpreting the FCRA, Safeco Ins. Co. of Am. v. Burr, 127 S. Ct. 2201, 2209 (2007). Dixon argues that under Safeco, common law terms used in the FCRA incorporate their common law meanings. A common law "offer," according to Dixon, is a set of terms that can be immediately accepted, in that the bargain could be concluded on terms that were clear to both parties. See Bourque v. FDIC, 42 F.3d 704, 708 (1st Cir. 1994); see also Restatement (Second) of Contracts, §§ 24, 26 (1981). Because Shamrock's mailer contained no terms and was not a common law offer immediately acceptable by the consumer, the argument runs, Shamrock violated the FCRA. 15 U.S.C. § 1681a(l).

---

[1] Dixon attempted to amend his complaint after the district court granted Shamrock's motion to dismiss. That motion to amend his complaint was denied. Dixon has not appealed the denial.

Our analysis of this question is largely controlled by our understanding of the FCRA in Sullivan.[2] The explicit definition within the FCRA of "firm offer of credit" precludes the operation of a common law definition of offer. See Safeco, 127 S.Ct. at 2209 ("[T]he general rule [is] that a common law term in a statute comes with a common law meaning, absent anything pointing another way.") (emphasis added); see also Sullivan, 2008 WL 726135 at *6.

Congress established within the FCRA a definition of a "firm offer of credit" that points to a meaning distinct from the common law definition. That definition is as follows:

> The term "firm offer of credit or insurance" means any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer, except that the offer may be further conditioned on one or more of the following:
>
> (1) The consumer being determined, based on information in the consumer's application for the credit or insurance, to meet specific criteria bearing on credit worthiness or insurability, as applicable, that are established--

[2]There are two significant differences between these facts and the facts of Sullivan: (1) Sullivan involved an appeal from a district court's grant of summary judgment to the defendant lender, and (2) the mailer at issue in Sullivan contained a maximum loan amount for the loan offered ("up to 100% of the value of your home"), a term that the mailer in Dixon did not. Id. 2008 WL 726135 at *1. We will explicitly acknowledge where we extend Sullivan to encompass the facts here.

>> (A) before selection of the consumer for the offer; and
>> (B) for the purpose of determining whether to extend credit or insurance pursuant to the offer.
>
> (2) Verification
>
>> (A) that the consumer continues to meet the specific criteria used to select the consumer for the offer, by using information in a consumer report on the consumer, information in the consumer's application for the credit or insurance, or other information bearing on the credit worthiness or insurability of the consumer; or
>>
>> (B) of the information in the consumer's application for the credit or insurance, to determine that the consumer meets the specific criteria bearing on credit worthiness or insurability.
>
> (3) The consumer furnishing any collateral that is a requirement for the extension of the credit or insurance that was--
>
>> (A) established before selection of the consumer for the offer of credit or insurance; and
>>
>> (B) disclosed to the consumer in the offer of credit or insurance.

15 U.S.C. § 1681a(l) (emphasis added). By explicitly defining "firm offer of credit," Congress has excluded other meanings, including those derived from the common law.

Moreover, the plain meaning of statutory language within the section excludes the common law meaning of "offer," because the FCRA specifically permits lenders to impose post-offer criteria that would be antithetical to the common law understanding of an "offer" as an immediately-acceptable set of terms. The statute allows a "firm offer of credit" to be conditioned on the consumer

meeting "specific criteria bearing on credit worthiness . . . for the purpose of determining whether to extend credit . . . pursuant to the offer."  Id. § 1681a(l)(1).  The statute also allows for verification that the consumer meets the lenders' additional specific criteria and that the consumer continues to meet the original specific criteria used to select the consumer for the offer.  Id. § 1681a(l)(2).  Thus, "firm offers of credit" cannot be immediately accepted because they may be conditioned on the consumer meeting the lender's internal criteria; and because the consumer might also be required to verify that he or she meets those additional internal criteria, and that he or she continues to meet the original, pre-screening, criteria.  Because extension of credit can be contingent on post-offer information, application of the traditional common law "offer" definition requiring immediate acceptability would run contrary to the plain meaning of the statute.

Taking a slightly different tack, Dixon suggests further that the lack of terms within the mailer constitutes a violation of the FCRA.  The mailer from Shamrock contained almost no material terms.  There was no mention of an interest rate or even a range of possible interest rates, or of the method for compounding interest. There was also no loan amount or range of possible loan amounts disclosed; nor did the mailer set forth the term of the loan or any costs or fees associated with the loan.  The disclaimers on the

reverse side stated that "[m]inimum and maximum loan amount apply" and that "[r]ates and programs subject to change at any time;" and also explained that "[this] offer is not guaranteed if you do not meet our criteria . . . ." Dixon argues that the failure to include terms such as the interest rate or the loan amount within the mailer render the mailer not a "firm offer of credit" under the FCRA.

We rejected a similar argument in Sullivan: "The term 'firm offer of credit' does not require [that] the offeror include additional terms other than the pre-selection criteria." Id., 2008 WL 726135 at *6; see also Hoge v. Parkway Chevrolet, No. H-05-2686, 2007 WL 3125298 at *13 (S.D. Tex. Oct. 23, 2007) ("Disclosure of the exact terms of an auto loan during the preapproval and solicitation process is not only beyond what the FCRA requires, it may be an unrealistic standard."); Soroka v. JP Morgan Chase & Co., 500 F. Supp. 2d 217, 222 (S.D.N.Y. 2007) ("The FCRA simply does not require that such terms [interest rate, repayment period] be included in firm offers of credit made pursuant to the statute.")

The contents of this mailer satisfy the FCRA, for two main reasons. First, Congress's choice to omit from the FCRA any requirement for the inclusion of loan terms is properly interpreted to mean that Congress did not intend to require any such terms. Sullivan, 2008 WL 726135 at *6. The FCRA's detailed requirements in some areas, i.e., disclosure statements regarding the use of

-10-

consumer reports in the pre-screening process and regarding opt-out provisions, 15 U.S.C. § 1681m(d)(1)(A)-(E), accompanied by silence on whether specific loan terms are required, indicates that disclosure of such terms is not required by the FCRA.

Second and moreover, a related statutory scheme, the Truth in Lending Act ("TILA"), id. § 1601, regulates the disclosure of loan terms. Regulations promulgated under the TILA specify how and when lenders must communicate specific loan terms to consumers. See 12 C.F.R. §§ 226.5a & 226.5b. The specificity of the TILA on disclosure of interest rates and repayment periods, and the FCRA's countervailing silence on the same, lead to the conclusion that failure to include specific terms in a firm offer of credit does not violate the FCRA. See, e.g., Sullivan, 2008 WL 726135 at *6; Soroka, 500 F. Supp. 2d at 222.[3]

In short, we agree with the district court that the statutory language of the FCRA does not mandate that pre-screened offers of credit conform to a common law definition of "offer," or that specific loan terms must be included in a firm offer of credit.[4]

_____

[3]The mailer sent to Dixon does not implicate the TILA requirements, as lenders are only required to disclose specific credit terms by a particular stage in the transaction: for mortgage loans, at the time a loan application is provided to the consumer. 12 C.F.R. § 226.5b(b).

[4]Even under the Seventh Circuit's "value" test from Cole, 389 F.3d at 726-27, requiring "firm offers of credit" to provide some "value" to the consumer, the mailer sent by Shamrock satisfies the requirements of the FCRA. There is value simply in the potential for improving one's credit score. See Perry v. First Nat'l Bank,

-11-

Finally, we address consumer privacy interests, an explicit focus of the FCRA: "There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4). A statutory scheme that permits lenders to access portions of an individual's consumer report, a repository of highly personal information, without that individual's consent countenances a non-trivial invasion of consumer privacy. Such an invasion was justified by Congress in enacting the FCRA by, on the one hand, the benefits it brings consumers in terms of greater access to credit, and by the presence of a safety valve -- the ability of consumers to opt out of the practice entirely -- on the other. See S. Rep. No. 103-209, 13-14 (1993) ("[Congress] seeks to balance any privacy concerns created by pre-screening with the benefit of a firm offer of credit or insurance" and "[Congress] is aware that some consumers may find that direct marketing and pre-screening entail an undesirable invasion of their privacy. Therefore . . . [the FCRA] creates an

_____

459 F.3d 816, 825 (7th Cir. 2006). In addition, a reasonable interpretation of the mailer's promise to Dixon that Shamrock would "pay off [his] revolving debt and refinance [his] mortgage balance at a lower rate" is that Shamrock was offering Dixon a loan with an interest rate at least lower than what he was currently paying on his outstanding debt, and of an amount equivalent to his revolving debt balance. The opportunity to contact Shamrock to see if he was eligible for such a loan, based on other pre-existing conditions, had some value for Dixon: he might be able to save money by refinancing his loan at a lower interest rate than his current rate. See Murray v. HSBC Auto Fin., No. 05 C 4040, 2006 WL 2861954 at *3 (N.D. Ill. Sept. 27, 2006).

-12-

'opt-out' procedure").  We cannot deny that Dixon suffered an invasion of privacy, but under this statutory regime, his remedy lies in the opt-out provision and not in the courts.

**<u>Affirmed</u>**.