In the

# United States Court of Appeals
## For the Seventh Circuit

————————

No. 07-1136

LAWRENCE N. CAVIN and THERESA CAVIN,
individually and on behalf of a class,

*Plaintiffs-Appellants*,

*v.*

HOME LOAN CENTER, INC., d/b/a HOMELOANCENTER.COM,

*Defendant-Appellee*.

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 4987—**Ruben Castillo**, *Judge.*

————————

ARGUED OCTOBER 24, 2007—DECIDED JULY 2, 2008

————————

Before FLAUM, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Home Loan Center, Inc. ("HLC")
sent Theresa and Lawrence Cavin each a mailer announc-
ing its SmartLoan mortgage program. The Cavins did
not respond to the letters, but instead filed suit in federal
court alleging that HLC violated the Fair Credit Re-
porting Act, 15 U.S.C. § 1681 et seq., by failing to present
them with a firm offer of credit. The parties filed cross-
motions for summary judgment, and the district court

granted judgment in favor of HLC. The Cavins appeal, and we affirm.

## I.

In 2005, HLC mailed letters offering its SmartLoan program to thousands of Illinois residents. Theresa and Lawrence Cavin were both among those recipients. The mailer was double-sided and informed the recipient that he was "pre-approved to receive HomeLoanCenter.com's exclusive SmartLoan program." In the top right corner of the letter, there was a box in which the figures 1.00%/4.27% appeared alongside the following two columns:

| Loan Amount | NEW Payment |
| --- | --- |
| $100,000 | $322 |
| $200,000 | $643 |
| $300,000 | $965 |
| $400,000 | $1287 |
| $500,000 | $1608 |
| $600,000 | $1930 |

The letter also stated that there were no fees to get the loan started and that HLC's Mortgage Experts could "pre-qualify [the recipient] right over the phone in minutes and provide [the recipient] with a customized loan program that suits [the recipient's] needs."

The reverse side of the letter provided that "[t]his offer may not be extended if, after responding to this offer you do not meet the criteria used in the selection process. Further, HomeLoanCenter.com will verify income and

employment, review credit, and analyze debt and your equity position in the subject property prior to final loan approval." Also on the reverse side, the starting rate for the mortgage was listed as 1.00% fixed for thirty days "with a fixed payment option for the first 12 months. Terms of payment are based on a margin of 2.10% plus the 1-Month MTA Index 2.022% (as of February 16, 2005)." The paragraph continued by listing the annual percentage rate for a $200,000 loan for a thirty-year term, but also stated that the APR "may change if the index adjusts after the first 30 days." Referring to the box on the front side of the letter, the paragraph noted that "the APR's corresponding to the listed payments are as follows: $100,000 loan amount, 5.16% APR; $200,000 loan amount, 4.471% APR; $300,000 loan amount, 4.437% APR; $400,000 loan amount, 4.419% APR; $500,000 loan amount, 4.408% APR; $600,000 loan amount, 4.401% APR." This paragraph of the mailer concluded:

> If minimum payment option is selected, deferred interest may accrue. Interest rate quoted assumes a credit score of 620+ with a loan-to-value (LTV) of 80% on a primary residence. The APR and payment will vary based on specific terms of the loan selected and verification of information and credits. Rates are subject to change without notice.

The mailer again stated that not all applicants would be approved and that terms and conditions applied. Finally, the letter included HLC's mailing address, as well as its toll-free telephone and fax numbers and website.

While the Cavins did not respond to the mailer, they filed a complaint alleging that HLC violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq., by accessing their credit information without a permis-

sible purpose. Specifically, the Cavins contend that the materials HLC sent them did not constitute a firm offer. The district court entered summary judgment in favor of HLC and denied the Cavins' motion concluding that HLC's mailing constituted a firm offer under the FCRA.

## II.

We review a district court's grant of a summary judgment motion de novo. *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 761 (7th Cir. 2008). When, as in this case, the parties have filed cross-motions for summary judgment, "we construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Premcor USA v. Am. Home Assurance Co.*, 400 F.3d 523, 526 (7th Cir. 2005).

Generally, a company receives a consumer's credit report only after the consumer initiates contact with the company. However, the FCRA provides an that "[f]irms may obtain lists of names and addresses that credit bureaus generate from their databases according to the stated criteria." *Murray v. New Cingular Wireless Servs., Inc.*, 523 F.3d 719, 721 (7th Cir. 2008). Under the FCRA, in order for a finance company to obtain an individual's credit report, the company needs to obtain it with the intent of extending a firm offer of credit to the potential customer. 15 U.S.C. § 1681b(c)(1)(B)(I). A "firm offer of credit" is "any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer except that the offer may be further conditioned . . . ." 15 U.S.C. § 1681a(l). Those conditions include a con-

sumer's eligibility based on the information in his application, verification of continued eligibility, and the consumer furnishing any required collateral for the extension of credit which is disclosed to the consumer in the offer. *Id.* The FCRA specifically sets out what is meant by verification:

Verification

(A) that the consumer continues to meet the specific criteria used to select the consumer for the offer, by using information in a consumer report on the consumer, information in the consumer's application for the credit or insurance, or other information bearing on the credit worthiness or insurability of the consumer; or

(B) of the information in the consumer's application for the credit or insurance, to determine that the consumer meets the specific criteria bearing on credit worthiness or insurability.

15 U.S.C. § 1681a(l)(2).

On appeal, the Cavins assert that HLC's mailer did not present a firm offer of credit because some of the material terms of the loan program were neither disclosed nor explained adequately. The mailer identified the basis for calculating interest, the length of the loan, the possibility of a rate change after thirty days, the minimum payment option with accompanying deferred interest, and the information needed to obtain the loan. As we recently noted, "[n]either § 1681a(l) nor anything else in FCRA says that the initial communication to a consumer must contain all of the important terms that must be agreed on before credit is extended. Trying to disclose everything in the first contact would make the document turgid

and, paradoxically, uninformative, because it would be harder to read and grasp." *Murray*, 523 F.3d at 723. Similarly, the FCRA does not require that terms of the loan be explained in the initial offer letter. In light of the information that is presented in HLC's mailer, the recipient is notified of the basic information regarding the loan. Further, we note that the proper inquiry in ascertaining whether a letter is a firm offer is whether the offer will be honored, not whether all of the material terms are listed. *Id.*

The Cavins contend that various phrases in HLC's letter also call into question whether the letter presented a firm offer of credit, pointing to language such as "not all applicants will be approved," "terms and conditions apply," and "rates are subject to change without notice," as indicia of the a lack of a firm offer. The Cavins' argument ignores that the FCRA permits a lender to condition the offer on the consumer's eligibility for the loan based upon factors, such as verification of income and provision of collateral. *See* 15 U.S.C. § 1681a(1)(2). These caveats may simply reflect the FCRA's allowed conditions, and in the absence of evidence to the contrary, this language does not make HLC's offer less firm. *See Murray*, 523 F.3d at 723-24. Further, additional information, such as a consumer's full credit history and income, is necessary for the lender to assess the particular rates and terms depending on the credit-worthiness of the consumer. "The statute does not require the revelation of these details as part of a 'firm offer'; but unless the algorithm in all its complexity is to be laid out, any honest offer will leave some matters for future determination." *Id.* at 724 (citing *Sullivan v. Greenwood Credit Union*, 520 F.3d 70 (1st Cir. 2008)).

The Cavins point to another phrase that reads: "This advertisement does not constitute an offer to enter into

an interest rate and/or discount point agreement." The Cavins assert that with this passage HLC "disclaimed the making of any kind of offer." HLC responds that this disclaimer language is required by Minnesota state law governing mortgage rate-lock agreements and that it did not change the text of the mailers depending on the recipient's state. *See* Minn. Stat. § 47.206 (governing mortgage rate-lock agreements, which are agreements in which a lender promises to guarantee or lock in an interest rate or number of discount points, or both, for a specified period of time and requiring that a written statement of current loan terms and conditions be accompanied by a disclaimer that the statement is not an offer to enter into a mortgage rate-lock agreement). The Cavins emphasize the first part of the sentence, "This advertisement does not constitute an offer . . . ." However, as the district court properly noted, reading the sentence in its entirety and in context of the entire letter "the language is merely an attempt by [HLC] to alert recipients of the mailers that the offer being pitched is *not* an offer to enter into a mortgage-rate lock agreement." *Cavin v. Home Loan Center, Inc.*, 469 F.Supp.2d 561, 569 (N.D. Ill. 2007). Therefore, this passage does not point to the absence of a firm offer of credit.

The Cavins also cite the minimal number of consumers who actually obtained the SmartLoan presented in the letter as evidence that HLC's letter did not present a firm offer. We find this argument unpersuasive. First, "most consumers who receive credit solicitations do not apply for the offered credit, regardless of how attractive the terms of the offer are." *Perry v. First. Nat'l Bank*, 459 F.3d 816, 826 (7th Cir. 2006). While the Cavins provide raw numbers, they do not provide a breakdown of those

who may have applied, but did not qualify, or the number of consumers who qualified for the SmartLoan, but instead simply elected to choose a different loan offer. In the absence of such evidence and also in light of the limited response to such solicitations, we conclude that the number of consumers obtaining the SmartLoan does not demonstrate that HLC's offer did not comply with the FCRA.

Finally, citing *Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 728 (7th Cir. 2004), the Cavins contend that HLC's mailers presented no value for consumers and thereby violated the FCRA. In *Cole*, the consumer received a letter offering a product and a minuscule line of credit toward the purchase of that product. We concluded that the letter at issue there violated the FCRA because it was a solicitation for merchandise rather than offering the consumer a firm offer of credit that had value as credit. *Id.* at 726-27. This case is distinct from *Cole* because HLC's letter did not offer any merchandise, such as a furniture suite or appliances, but only presented a mortgage offer. "When credit histories are used to offer credit (or insurance) and nothing but, the right question is whether the offer is 'firm' rather than whether it is 'valuable.'" *Murray*, 523 F.3d at 722. Therefore, the Cavins do not prevail on their FCRA claim by contending that HLC's letter lacked value. HLC offered recipients of its letter a first lien mortgage by presenting information that the SmartLoan program was an adjustable-rate loan, based on the MTA index, with a 1% interest start rate, and a term of 30 years. The mailer further provided information regarding interest rates, monthly payments, and the method of calculation. Therefore, we conclude that HLC's mailer presented a firm offer of credit.

### III.

We conclude that HLC's letter presented a firm offer of credit, despite the absence of some material terms and the minimal number of consumers who obtained the SmartLoan. Accordingly, HLC did not violate the FCRA, and the district court properly granted summary judgment in favor of HLC. We AFFIRM.